IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| CHRISOTPHER R.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:21-cv-00059 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | By: Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Christopher R. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decision denying his applications for disabled child insurance

benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28 U.S.C. §

636(b)(1)(B). Having considered the administrative record, the parties' arguments, and the

applicable law, I cannot find that the Commissioner's denial of benefits is supported by

substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge

reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see

also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is

limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person aged 18 years or older is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[2] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the

Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in

the Act's regulations; (4) can return to his or her past relevant work based on his or her residual

functional capacity; and, if not (5) whether he or she can perform other work.[3] *See Heckler v.*

*Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017);

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step

four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the

claimant is not disabled. *See id.*

## II. Procedural History

Christopher applied for SSI in August 2019 and disabled child insurance benefits in

October 2019. *See* Administrative Record ("R.") 207–15. He alleged that he became disabled on

August 1, 2016, R. 207, because of bipolar disorder, depression, Post-Traumatic Stress Disorder

("PTSD"), diabetes, neuropathy in the legs, and "his pancreas no longer worked." R. 61. After a

review of his medical records, a psychologist for Disability Determination Services ("DDS"), the

state agency, added disruptive mood dysregulation disorder and attention deficit hyperactivity

disorder ("ADHD") as "other" impairments. *See* R. 65–66. Christopher was nineteen years old,

or a "younger person" under the regulations on his alleged onset date. R. 61; 20 C.F.R. §§

404.1563(c), 416.963(c). DDS denied Christopher's claims initially in January 2020, R. 72–83,

85–86, and upon reconsideration in September 2020, R. 103–04, 114. In March 2021,

Christopher appeared with counsel at an administrative hearing before ALJ H. Munday. R. 35–

56. Christopher testified, R. 39–52, as did a vocational expert ("VE"), R. 52–56.

---

[3] "A claim for disabled child's insurance benefits is analyzed under the same five-step sequential process . . . , [except] the claimant must also have a disability that began before he [or she] reached age 22." *Dalton v. Berryhill*, No. 7:17cv519, 2018 WL 5621981, at *1 n.1 (W.D. Va. Oct. 30, 2018) (cleaned up); *see* 20 C.F.R. §§ 404.350–352.

ALJ Munday issued an unfavorable decision on May 19, 2021. R. 12–27. She first found that Christopher "had not attained age 22 as of August 1, 2016, the alleged onset date," R. 14, and that he had not worked since that time, R. 15. ALJ Munday found that Christopher had the following "severe" medically determinable impairments ("MDI") during the relevant period: diabetes mellitus, neuropathy, depression, PTSD, and ADHD. R. 15. She also discussed Christopher's other MDIs (cataracts, blepharitis, and glaucoma) and found them to be non-severe. *Id.* She did not mention disruptive mood dysregulation disorder as a potential MDI. None of Christopher's severe impairments, alone or combined, met or medically equaled the severity of any relevant Listing. *See* R. 16–17 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 11.14, 12.04, 12.11, 12.15). As part of her Listings analysis, ALJ Munday found that Christopher's severe mental MDIs caused "mild" limitations in his overall abilities to interact with others; to understand, remember, and apply information; and to adapt and manage himself; and "moderate" limitations in his overall ability to concentrate, persist, or maintain pace. R. 17 (citing R. 40–52 (hearing testimony); R. 265–73 (Ex. 7E); R. 667–700 (Ex. 4F)).

ALJ Munday then evaluated Christopher's residual functional capacity ("RFC") and found that he could perform "light work"[4] except:

> he can only occasionally crawl and climb. He can occasionally use foot controls with the bilateral lower extremities. He can have occasional exposure to vibrations and hazardous conditions (including unprotected heights and moving machinery). He can perform simple, routine tasks. No work at a fixed production rate pace, such as rapid assembly line work where co-workers are side-by-side and the work of one affects the work of the other. He can have occasional interaction with [the] general public.

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these strength demands can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); *see* SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

4

R. 18. Christopher had no past relevant work. R. 25. ALJ Munday asked the VE to assume a

hypothetical person who "is able to perform light work with occasional crawling and climbing;

occasional foot controls with the bilateral lower extremities; occasional exposure to vibrations[;]

[o]ccasional exposure to hazardous conditions…; able to perform simple, routine tasks; no work

at a fixed production rate pace . . .; and occasional interaction with the general public." R. 54.

Relying on the VE's testimony, ALJ Munday found that this RFC would have allowed

Christopher to do certain light "unskilled" occupations (marker/retail trade, routing clerk, and

automatic car wash attendant) existing in the national economy. R. 26 (citing R. 54–55). Thus,

ALJ Munday concluded that Christopher was not disabled from August 1, 2016, through May

19, 2021. R. 26–27. The Appeals Council declined to review that decision, R. 1–3, and this

appeal followed.

III. Discussion

Christopher challenges the Commissioner's denial of benefits on three grounds. *See* Pl.'s

Br. 1, 4–12, ECF No. 15. First, Christopher argues that ALJ Munday did not logically explain

why Christopher's severe mental MDIs caused only "mild" limitation in his overall ability to

interact with others. *See id.* at 5 (citing R. 17). He also objects that the ALJ's "invalid" finding at

Step Three resulted in an RFC finding that did not "account for [his] limitation in dealing with

others *generally*," including co-workers and supervisors. *Id.* at 6 ("[T]he overwhelming evidence

is that [Christopher's] limitation in interacting with others was not merely mild. Thus, there was

no substantial evidence that [he] could have even occasional contact with [co]workers and

supervisors."). Second, Christopher challenges ALJ Munday's reasons for finding that his

diabetes symptoms—primarily neuropathic pain and numbness or tingling in the lower

extremities—were not as debilitating as Christopher described in his statements to the agency.

*See id.* at 7–10 (citing R. 24). He argues that ALJ Munday "was required to explain why the subjective evidence did *not* show that the pain [he] alleged was so continuous and/or severe that it prevented [him] from working a full eight-hour day[,]" and "failed to provide this explanation." *Id.* at 6 (internal quotation marks omitted). Finally, Christopher argues that ALJ Munday erred "by assessing [his] function report as having been written by [him], an interested party, rather than by his mother, whose interest in the case was not necessarily aligned with" her son's. The ALJ also erred by failing to make a credibility finding as to [the mother's] statements" in that function report. *See id.* (citing R. 245–52 (Ex. 4E)).

The court will focus on Christopher's first argument; specifically, that ALJ Munday's RFC restricted Christopher to "occasional" interaction with the public, but did not address his remaining ability to interact with coworkers and supervisors for eight hours a day, five days a week in an ordinary workplace. ALJ Munday's explanation for the RFC does not address this specific functional area, despite evidence in the record showing Christopher's anti-social tendencies and general dislike of people. She had a duty to explain how she weighed that evidence in determining Christopher's RFC and to explain why the RFC finding includes no limitation on Christopher's interaction with coworkers or supervisors. I find this argument warrants reversal of the Commissioner's final decision and remand for further administrative proceedings.

A.    *Summary*

1.    *Mental Health Treatment Records*

Christopher's medical records from Crossroads Community Services Board ("CSB") show a history of treatment for ADHD and bipolar II disorder starting in his early teens. R. 667 (Ex. 4F). In March 2014, he "dropped out" of Crossroads CSB's treatment program and stopped

taking his psychotropic medications because "he suddenly developed a case of very brittle diabetes." *Id.* In March 2019, Christopher reestablished care at Crossroads CSB to get help with "poor sleep and some symptoms of depression," including sadness, lack of motivation, *id.*, and feeling "withdrawn," R. 671. On exam, Norman Holden, M.D., observed that Christopher was "cooperative" and fully oriented with normal speech and thought processes, and "intact" memory, attention/concentration, and fund of knowledge. R. 670–71. He exhibited "depressed" mood with congruent affect. R. 671. Dr. Holden prescribed Wellbutrin for depression, Zoloft for social withdrawal, and Seroquel for sleep. *Id.* Dr. Holden noted the same normal findings on comprehensive mental-status exams in May 2019, R. 678–79; August 2019, R. 688–89; and December 2019, R. 698–99. Christopher also had a "euthymic" mood with "normal," congruent affect at those visits. R. 679, 689, 699. Dr. Holden continued Christopher's medications in May 2019, R. 679, but increased them in both August and December 2019, R. 687, 698.

In August 2019, Christopher's CSB case manager told Dr. Holden that Christopher had started taking GED classes five days a week. R. 687 ("Today, the patient's case manager Nicole is present and she informs me that he has begun GED classes and these classes are five days a week."). Christopher added that his ability to focus "really isn't good at all for his GED classes, which are primarily in the daytime." *Id.* That September, Christopher told his case manager that he "gets along well with his family which includes his parents and siblings," but he "tends to isolate himself." R. 692. He was still "involved in GED classes" as of December 2019. R. 697. He signed up for a GED tutor in late February 2020, R. 729, but stopped the following month when the COVID-19 began, R. 730.

In March 2020, Christopher was "trying to keep away from others as much as he could to help prevent the spread of the COVID-19 virus." R. 730. He took GED classes online. *Id.* That

June, Christopher reported being "happy with his medication regimen in helping with focus and . . . depression," but he still had trouble sleeping several nights a week. R. 748 (Ex. 8F). By October, he was "sleeping better" and his "mood [was] stable." R. 750. The CSB provider noted that Christopher was "very pleasant, clear[,] and coherent" during a brief telemedicine visit in October 2020, *id.*, and was "on top of things," "pleasant," "cheerful, clear[,] and coherent" during his next virtual visit in January 2021, R. 992. Other treatment providers also consistently described Christopher as "pleasant" with normal mood, affect, and social behaviors throughout the relevant time. *See, e.g.*, R. 391, 406, 471, 502, 655, 692, 698.

       2.    *Medical Opinions*

David Bristow, M.D., and Daniel Walter, Psy.D., reviewed Christopher's records for DDS in January 2020. *See* R. 61–72; R. 74–86. Dr. Bristow opined that Christopher's loss of central visual activity was a primary "severe" medical impairment, R. 66, 79, his diabetes mellitus was a secondary "severe" medical impairment, *id.*, and his peripheral neuropathy was also "severe." *Id.* As a result, Dr. Bristow limited Christopher to "light work," R. 69, finding that he could "occasionally" lift or carry 20 pounds, "frequently" lift or carry 10 pounds, stand or walk (with normal breaks) for six hours in an 8-hour workday, and sit (with normal breaks) for about six hours in an 8-hour workday, but he had no other work-related restrictions, *id.* Dr. Bristow attributed these limitations to "diabetes, neuropathy[,] and vision limitations." *Id.* Dr. Walter opined that Christopher had "severe" trauma and stressor-related disorders, "severe" depressive, bipolar, and related disorders, and "non-severe" ADHD. R. 66, 79. He found that Christopher had sustained concentration and persistence limitations, R. 70, 83, and was "moderately" limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and "complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." *Id.* Dr. Walter explained that Christopher had "some limitations due to mood and focus, but these are well-controlled with meds at this time." *Id.* Dr. Walter also found that Christopher had social interaction limitations, R. 70, 84, and was "moderately" limited in his ability to "interact appropriately with the general public" and to "get along with coworkers or peers without distracting them or exhibiting behavioral extremes." R. 71, 84. He attributed these limitations to "some social avoidance secondary to mood." *Id.* Christopher was "not significantly limited" in his abilities to ask for help and to "accept instructions and respond appropriately to criticism from supervisors." *Id.* Robert McGuffin, M.D., and Stephen Saxby, Ph.D., generally affirmed these findings after reviewing Christopher's records on reconsideration for DDS in September 2020. R. 100–02. The only difference between Dr. Saxby's opinion and Dr. Walter's opinion was that Dr. Saxby found that Christopher was "moderately limited" in his ability to interact appropriately with supervisors, as well as coworkers and the public, because he had "[s]ome social avoidance due to mood." R. 102.

   3.     *Subjective Statements*

   Christopher and his mother, Carla, jointly filled out an Adult Function Report ("AFR") in December 2019.[5] R. 244–52 (Ex. 4E). In this report, Christopher stated that he "constantly stay[s] in pain, [he is] a very depressed person [and] does not like to be around a lot of people. [His] legs and feet hurt so bad [and] [he] [doesn't] sleep very much." R. 245. On an ordinary day, Carla checked his blood sugar levels, gave him medicine, and fixed his breakfast. *Id.* Christopher "stay[ed] in bed a lot because [he] just like[d] being alone." *Id.* His depression and

---

[5] Based on the handwriting styles and use of pronouns in the function report, it appears that Carla wrote portions on Christopher's behalf, *see, e.g.*, R. 245, and portions stating her own observations, *see, e.g.*, R. 252, and Christopher wrote portions for himself. *See, e.g.*, R. 247. Carla signed the report indicating that she "complete[d]" the form. R. 252.

"constant" leg and arm pain impacted his ability to sleep. *Id.* He needed reminders to take care of personal needs and grooming "because [he got] so depressed" that he did not "want to come out of [his] room." R. 247. Christopher did not prepare his own meals, but he "sometimes" tried to help his mom. *Id.* He did not do many chores, but he "tri[ed] to help [his] mom with laundry sometimes," which took him "a long time" to do. *Id.* Regarding his hobbies and interests, Christopher enjoyed listening to music in his room daily, and before his illnesses he used to play sports, hunt, and fish. R. 249. His primary social interaction was with his grandmother before she passed away *Id.* He did not "like going anywhere much," but "[had] to go to [the] doctors." *Id.* Christopher "sometimes" had to be reminded to go places and did not "like being around people." *Id.* Christopher described himself as "very irritable" and twice noted that he did not "like being around people much." R. 249–50. He "used to have friends," but "when [he] got sick they [did not] come around." *Id.*

Christopher reported that his medical conditions affected all his work-related functional capacities, except for talking and hearing. R. 250. He had difficulty paying attention, did not finish tasks, got confused and angry trying to follow written instructions, and could not remember spoken instructions. *Id.* Asked to describe how well he got along with "authority figures," Christopher wrote, "I have a hard time getting along with anyone. Just stay to myself." R. 251. He could not handle stress and did not change his daily routine. *Id.* ("Every day is the same."). Christopher attributed his social aversion to persistent depression. *See* R. 250 ("I stay depressed so I don't get along with anyone."); R. 251 ("I stay so depressed and just like being alone."). At the end of his function report, Carla commented on Christopher's abilities. *See* R. 252. She expressed that her "son has a very hard time each and every day due to him being a very depressed person." *Id.*

10

In a second AFR filled out by Carla, R. 265–73 (Ex. 7E), she stated that Christopher had "mood swings," was "irritabl[e]," and did "not like to be around others," all of which limited his ability to work. R. 265. Christopher "struggle[d]" to keep his room clean, but he got "angry when [Carla] tr[ied] to help" him. R. 268 ("Christopher's mood swings and anger [are] so bad he does not want anyone to help[.]"). He isolated himself and did "not want to be or do anything with anyone most of the time." R. 269. He spent the evenings alone in his bedroom watching TV or listening to music. R. 266. He kept the TV on, so it felt "like he has a friend in [his] room with him." *Id.* He did not shop because he did "not like being around people." *Id.* He "use[d] to enjoy fishing but now he isolates himself to his room to be alone." R. 270. Christopher also had "no desire to do much of anything anymore with his mood swings [and] anger issues." *Id.* Regarding his social activities, Carla stated that Christopher spoke to her "maybe 1 or 2 times a week." *Id.* Otherwise, "[it's] a lot of Christopher saying 'leave me alone can I just be left alone.'" *Id.* He had "problems getting along with family, friends, neighbors, or others" because he did "not like to be around anyone other than [Carla] and his [d]ad due to his depression." R. 271. Carla reported that Christopher did not get along well with authority figures "at all," and "got kicked out of school in 10th grade." R. 272. He cannot handle stress or changes in routine, and he "fears he won't ever have friends because of his depression." *Id.* In her remarks at the end of the report, Carla noted that "Christopher pushes everyone away and then cries how he wished he could be normal." R. 273.

On March 17, 2021, Christopher testified before ALJ Munday in a telephone hearing. R. 33–56. Christopher detailed his mental impairments that prevented him from working, which were PTSD, anxiety, depression, ADHD, and bipolar disorder. R. 41–42. Asked what he believed were his most severe medical impairment at that time, Christopher stated, "probably"

his "anxiety and [his] PTSD." R. 44; *see also* R. 52. He saw a therapist once a month and took

medication, which "help[ed]" his symptoms by making him "a little bit more calm[]" and

keeping him "stabilized." *Id.* About two to three days a week, however, Christopher did not want

to be around anyone. R. 44. He had difficulty sleeping, and if he was "lucky," he would get

about four hours of sleep each night. *Id.* He had difficulty going into large crowds. *Id.* (Q: "Do

you have difficulty going in large crowds, like going to Walmart and things like that." A: "Yes,

sir."). He also had trouble concentrating, stating "[his] attention span seems to get the best of

[him]," R. 44–45, and medication did not help "like it should," R. 45. He mainly kept to himself

and watched television, but he could "[n]ot really" watch an entire show because it did not

"make sense." R. 47.  ALJ Munday asked if Christopher had any siblings or friends that he spent

time with. Christopher responded, "ha[s] siblings," and "one person you could say was [his]

friend. But [he] don't really associate with nobody. [He] usually tend[ed] to stay to [him]self.

[He's] just that type of person." R. 51–52. Asked why he could not do work that did not involve

heavy lifting, Christopher responded that he "stay[s] so sick" that he did not have "the energy or

the motivation to really just push through and do it." R. 52. He attributed the lack of motivation

to his anxiety and depression, explaining, "I just don't like being around a whole lot of people.

And I like to stay to myself." *Id.*

B.      *The ALJ's Decision*

        ALJ Munday summarized much of this evidence in her written decision. *See* R. 17–25.

At step two, she found that Christopher had the following severe MDIs: diabetes mellitus,

neuropathy, depression, PTSD, and ADHD. *Id.* These MDIs were "severe" because they

"significantly limit[ed] [Christopher's] ability to perform basic work activities," *id.*, which

according to the regulations include "mental functions like "understanding, carrying out, and

remembering simple instructions"; "responding appropriately to supervision, co-workers and usual work situations"; and "dealing with changes in a routine work setting," 20 C.F.R. §§ 404.1522(b)(1), (3), (5)–(6), 416.922(b)(1), (3), (5)–(6). At step three, she found that Christopher's severe mental MDIs caused "mild limitations" in his overall ability to interact with others because, while Christopher "alleged that he ha[d] difficulty engaging in social activities, getting along with others, dealing appropriately with authority, and spending time in crowds," he nonetheless "was able to live with others" and healthcare providers described him as "pleasant and cooperative." R. 17 (citing R. 40–52 (hearing testimony); R. 265–73 (Ex. 7E); R. 667–700 (Ex. 4F)).

Next, ALJ Munday concluded that Christopher retained the physical RFC to perform "light work" except he could "only occasionally crawl and climb," and "occasionally use foot controls with the bilateral lower extremities." R. 17–18. Christopher could occasionally be exposed "to vibrations and hazardous conditions." R. 18. She also found that he could "perform simple, routine tasks," but "[n]o work at a fixed production rate pace, such as rapid assembly line work where co-workers are side-by-side and the work of one affects the work of the other." *Id.* Finally, ALJ Munday limited Christopher to "occasional interaction with [the] general public." *Id.* She did not restrict his interaction with co-workers or supervisors. *See id.*

As part of her RFC analysis, ALJ Munday found that Christopher's MDIs "could reasonably be expected to cause [his] alleged symptoms," R. 19; *see* R. 18–19 (summarizing testimony), but that his "statements concerning the intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained" elsewhere in her decision, R. 19; *see* R. 24. First, she found that the treatment Christopher "received for his diabetes, neuropathy, and mental impairments

[was] routine and conservative overall, consisting primarily of medications and therapy." R. 24 ("The claimant has not generally received the type of medical treatment one would expect for the severity of symptoms alleged."). Moreover, although Christopher "testified . . . that he was always compliant with his [diabetes] medications," *id.*; *see* R. 18 ("He testified that he is compliant with his diabetic medications."), contemporaneous medical records "show[ed] noncompliance with insulin, diet, and blood glucose monitoring," R. 24; *see* R. 19–23. Second, while Christopher alleged "significant fatigue and problems due to his legs," "repeated physical examinations failed to demonstrate any ongoing deficits in strength, sensation, reflexes, or gait as would be expected with the degree of limitation alleged." R. 24. On the contrary, those physical exams were "frequently unremarkable apart from decreased sensation in his feet." *Id.*; *see* R. 19–23.

Third, despite Christopher's testimony that he "had trouble with focus, stay[ed] to himself, generally stay[ed] in his room, and ha[d] few daily activities, his mental status examinations were frequently unremarkable apart from occasional abnormalities in mood and affect. He was consistently oriented with normal thought process and he generally had intact memory and concentration." R. 24. Further, "the claimant's mental status examinations failed to demonstrate any significant abnormalities on an ongoing basis, as would be expected with the degree of limitation alleged." *Id.* Finally, ALJ Munday concluded that "further physical and mental limitations," i.e., restrictions beyond those included in her RFC finding, were "not supported by the record at this time." *Id.* To support that conclusion, the ALJ cited a handful of progress notes created between June 2018 and March 2020 showing Christopher had reported "playing basketball twice a week," *id.* (citing R. 406); "walking for exercise," *id.* (citing R. 524, 629); "working in the yard with brush," *id.* (citing R. 655); "continuing his hobby of deer

14

hunting," *id.* (citing R. 697); and "attending GED classes through a community college," *id.* (citing R. 685, 687).

Next, ALJ Munday evaluated the DDS opinions. *See* R. 25. She characterized those opinions as showing Christopher was "capable of performing light work," had "'some limits' in concentration, persistence, and pace 'due to mood and focus, but [they were] well controlled,'" and had "'[s]ome social avoidance secondary to mood.'" R. 25 (quoting R. 71, 84, 102). ALJ Munday found the DDS reviewers' evaluations of Christopher's "physical and mental functioning . . . to be generally consistent with the medical evidence of record, including treatment notes and laboratory results," and found them persuasive. *Id.* Nevertheless, ALJ Munday noted that her RFC finding "included more precise mental limitations and some additional limitations to account for the . . . decreased sensation" in Christopher's feet. *Id.*; *see* R. 24 ("[T]he claimant has been limited to light work with some postural and environmental limitations to accommodate the reduced sensation in his feet.").

C.    *Discussion*

Christopher's prevailing argument challenges ALJ Munday's mental RFC assessment. A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his or her medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019); *see* 20 C.F.R. §§ 404.1545, 416.945. First, the ALJ must identify the claimant's impairment-related "'functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Mascio v. Colvin*, 780 F.3d 632, 636

(4th Cir. 2015) (quoting SSR 96-8p, 1996 WL 374184, at *3)); *see* 20 C.F.R. §§ 404.1545(b)–

(c), 416.945(b)–(c) (physical and mental functions). Second, the ALJ's decision must provide a

"narrative discussion describing" how specific medical facts and non-medical evidence

"support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and

logically explaining how the ALJ weighed any conflicting or inconsistent evidence in arriving at

those conclusions, *Thomas*, 916 F.3d at 311. Thus, a proper RFC analysis has three components:

(1) all relevant evidence considered under the correct legal standard, (2) an accurate and logical

explanation of how the evidence supports the ALJ's findings, and (3) conclusion. *See Thomas*,

916 F.3d at 311; *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). "The second component,

the ALJ's logical explanation, is just as important as the other two. Indeed, precedent makes

clear that meaningful review is frustrated when an ALJ goes straight from listing evidence to

stating a conclusion." *Thomas*, 916 F.3d at 311 (citing *Woods*, 888 F.3d at 694). Meaningful

review of the RFC determination is also frustrated "where an ALJ fails to assess a claimant's

capacity to perform relevant functions[] despite contradictory evidence in the record[.]" *Monroe*

*v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

Because this case turns on ALJ Munday's failure to fully address Christopher's alleged

social limitations, particularly his ability to interact with coworkers and supervisors in an

ordinary workplace, *see* 20 C.F.R. §§ 404.1545(b), 416.945(b), the analysis will focus on that

argument.

Christopher argues that ALJ Munday erred by "failing to account for [his] limitations in

his ability to interact with others." Pl.'s Br. 4. Specifically, he argues that ALJ Munday

incorrectly found as part of her Listings analysis that Christopher "was only mildly limited in his

ability to interact with others" and that because this "premise [was] false," her subsequent mental

16

RFC finding that Christopher could "have occasional interaction with the public [was] invalid." *Id.* at 5–6. He contends that ALJ Munday's explanation for finding a mild limitation is "totally insufficient." *Id.* at 5. He also asserts that the RFC fails to account for Christopher's "limitation in dealing with others *generally*," including "[co]workers and supervisors." *Id.* at 6.

ALJ Munday's decision does not address any limitation on Christopher's ability to interact with coworkers and supervisors. *See* R. 24. The Fourth Circuit "has held that remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Monroe v. Colvin*, 826 F.3d at 188 (internal quotation marks omitted). When the court is "left to guess about how the ALJ arrived at [her] conclusions on [a claimant's] ability to perform relevant functions[,] . . . remand is necessary." *Mascio*, 780 F.3d at 637. Additionally, "ALJs must build an accurate and logical bridge from the evidence to their conclusions." *Arakas v. Comm'r Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020).

Here, ALJ Munday failed to address Christopher's capacity to interact with coworkers and supervisors despite contradictory evidence in the record. In *Monroe*, the ALJ "found that [the claimant] had severe impairments of sleep apnea and narcolepsy, and he concluded that [the claimant's] impairments could reasonably be expected to cause his claimed symptoms. Nevertheless, he never made specific findings about whether [the claimant's] apnea or narcolepsy would cause him to experience episodes of loss of consciousness or fatigue necessitating breaks in work and if so, how often these events would occur." 826 F.3d at 187. Similarly, at step two, ALJ Munday concluded that Christopher had "severe" depression, PTSD, and ADHD, which would "significantly limit" his "ability to perform basic work activities," R. 15, which include "responding appropriately to supervision, co-workers and usual work

situations," 20 C.F.R. §§ 404.1522(b)(5), 416.922(b)(5). Nevertheless, she did not make specific findings about whether those impairments would impact Christopher's ability to interact with supervisors or co-workers in a typical work setting for eight hours a day, five days a week, as the regulations required. *See* 20 C.F.R. §§ 404.1545(c), 416.945(c); *cf. Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) ("Th[e] RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step[s 2 and 3] concerning the nature and severity of the claimant's [mental] impairments."). She did limit Christopher to only occasional interaction with the public, but her decision lacks the necessary "narrative discussion describing" how specific relevant evidence in Christopher's record supports that RFC finding. *See Thomas*, 916 F.3d at 311 ("[M]eaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion.").

Additionally, ALJ Munday failed to explain how she weighed probative evidence tending to support Christopher's claim that his mental impairments significantly limited his ability to interact with people generally, not just with strangers or members of the public. Throughout his testimony and function report, Christopher and his mother expressed his dislike of being around other people and his preference of being alone, *see, e.g.*, R. 44, 52, 245, 249–51, 265–73, which ALJ Munday acknowledged, R. 24 ("Although he testified he . . . stays to himself, generally stays in his room, and has few daily activities . . . ."). ALJ Munday found that Christopher's mental MDIs could reasonably be expected to cause those symptoms, but that his statements describing their intensity, persistence, or limiting effects were "inconsistent" with treatment records showing his mental status exams "were frequently unremarkable apart from occasional abnormalities in mood and affect." R. 24. ALJ Munday's findings from treatment records that Christopher was "consistently oriented with normal thought process and he generally

had intact memory and concentration" *id.*, are irrelevant to his social interaction and do not support the ALJ's implied RFC finding that Christopher had no problems interacting with coworkers or supervisors in an ordinary workplace. *Cf. Mascio*, 780 F.3d at 639 (finding that the ALJ did not properly analyze the claimant's credibility by discrediting her statements as to pain on the basis that she "had not complied with follow-up mental health treatment" because that "reason ha[d] nothing to do with pain").

In addition to the ALJ's RFC analysis, and reading the "ALJ's decision as a whole," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018), at step three, ALJ Munday discussed Christopher's social interactions, finding he had "mild" limitation in interacting with others. *See* R. 17. Although she cited to Carla's function report to support Christopher's ability to live with others, *id.* (citing R. 265–73), she did not address Carla's repeated comments in that same report that Christopher self-isolated at home and did not like being around others. *Cf. Lewis*, 858 F.3d at 879 (reversing and remanding in part because ALJ cherry picked "normal" findings from medical reports that also documented abnormal findings).

Furthermore, Dr. Saxby, the DDS psychologist who reviewed Christopher's claim in September 2020, opined that he was "moderately" limited in his abilities to "interact appropriately with the general public," "get along with coworkers or peers without distracting them or exhibiting behavioral extremes," and "accept instructions and respond appropriately to criticism from supervisors." R. 102. He attributed all three limitations to evidence of "some social avoidance secondary to mood." *Id.* ALJ Munday acknowledged the DDS psychologists' shared opinion that Christopher had "'some social avoidance due to mood,'" R. 25 (quoting R. 71, 84, 102), and restricted Christopher to occasional interaction with the public, R. 18. She

failed explain, however, why the RFC did not reflect Dr. Saxby's opinion that Christopher also had "moderate" limitations interacting with coworkers and supervisors. *See* R. 25.

The Commissioner argues that ALJ Munday's error is harmless because "two of the jobs identified by the vocational expert do not require significant social interaction." Def.'s Br. 19, ECF No. 19. ALJ Munday's hypothetical question to the VE only addressed occasional interaction with the general public and did not discuss interaction with coworkers and/or supervisors. R. 54. "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *See Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006). Because ALJ Munday "never determined the extent to which [Christopher]" could interact with coworkers and/or supervisors, the Court "cannot determine whether the hypothetical questions posed to the VE included all of [Christopher's] functional limitations, as they needed to do in order to be useful," *Monroe*, 826 F.3d at 188.

Not only did ALJ Munday fail to address any limitation on Christopher's ability to interact with coworkers and supervisors, she offered only a cursory conclusion that "further mental and physical limitations are not supported by the record at this time" and pointed to various parts of the record to support that conclusion. R. 24. The only evidence the ALJ discussed that would arguably relate to interacting with coworkers and supervisors was the fact that Christopher "reported he was attending GED classes through [a] community college" in August 2019 and "continued to report GED classes" in December 2019, February 2020, and March 2020. *Id.* (citing R. 685, 687, 697, 692–93). Even if ALJ Munday used this evidence to support her implied conclusion that Christopher had no limitations interacting with coworkers or supervisors, she did not explain why Christopher's GED class attendance supported that

20

conclusion. *See id.* She did not address how often he attended classes, and the record contains no information about how much social interaction Christopher had when he attended those classes in person, *see* R. 687, 697, 729. Moreover, the classes had moved online by late March 2020. Considering these facts, the ALJ failed to "build an accurate and logical bridge" from the evidence to her conclusion, *Arakas*, 983 F.3d at 95, and as a result, I am "left to guess about how [she] arrived at [her] conclusions on [Christopher's] ability to perform relevant functions." *Mascio*, 780 F.3d at 637. For all these reasons, ALJ Munday's decision "lacks the specific analysis that would allow for meaningful review," *Monroe*, 826 F.3d at 189, and remand is appropriate.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Christopher's Motion for Summary Judgment, ECF No. 14; **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 18; **REVERSE** the Commissioner's final decisions denying Christopher's disabled child's insurance benefits and SSI claims; **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g); and **DISMISS** this case from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

21

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: March 3, 2023

Joel C. Hoppe
United States Magistrate Judge